Good morning, your honors. My name is Sarah Turner. I'm a deputy attorney general for the state of California, and I represent the appellate, the health care manager at Pelican Bay State Prison, Dr. Winslow, and we're asking this court to reverse the district court's denial of qualified immunity as to this individual. In deciding a case on qualified immunity, the Supreme Court in Saussure v. Katz requires an analysis of two questions and that they may be made in sequence. First, take an example of a person in the light most favorable to the party asserting the injury, in this case, the plaintiff. Do the facts alleged show that the prison official's conduct violated a constitutional right? I have a problem at that stage. I am naturally attracted to the idea of qualified immunity for a prison doctor because it's hard to see how you can be a prison doctor without a lot of immunity. But it looks like on the record in this case, taking the facts most favorably to Tatum, the Supreme Court in Pelican Bay, the prison doctor was repeatedly told over a period of several years, this guy needs a liver biopsy, and he didn't authorize it. And if you take the facts most favorably to Tatum on that, also Tatum was at times more or less sane during that period and wasn't certified to be too insane to take his meds. And it looks like the doctrine is pretty clear that the legal doctrine, if you take it at the appropriate level of generality, I don't really understand how you can win anyway but at a jury trial. Your Honor, Dr. Winslow is the health care manager. He's not a treating physician. Yeah, but they came to him for authorization for the biopsy. They never did. They never came to him for authorization. They never requested authorization from Dr. Winslow. That is what you do when you want a surgical procedure done, which would have been the liver biopsy. In fact, Dr. Winslow was not aware of this case until the lawsuit was served, and then also then I asked him after that to prepare to examine the file and prepare a declaration. He had been requested one time to approve a liver biopsy. It wasn't once enough. And he approved it. That is once is enough. And he approved it. That was January 30, 2001. He approved it. And that was Dr. Wolf. By then, Mr. Tatum had been cleared psychiatrically to continue to be able to take the medication, which has very serious side effects, one of them being depression. And prior to that time, he was very noncompliant with his psychiatric medications. He regularly refused to see the psychiatrist and stopped his own medications. So this is a person who clearly was depressed in 1998. And he did take his medication. He was approved by the psychiatrist at the end of 2000 to take the medication. So he did improve. And it was important to him to have the medication. So I think the psychiatrist thought it was good. You say Dr. Winslow wasn't aware, but shouldn't he have been aware? Because there were eight requests? Well, actually, to request it, they just wrote it in their chart. They wrote it in their chart. They need to have a surgical procedure, which is going to be similar in any environment, in any medical office or HMO or PPO, you need to request the surgical procedure be done. It actually requires anesthesia. And none of them requested it until Dr. Wolf did in the beginning of 2001. And I can only speculate as to why these doctors didn't do that. I don't understand what you just said. The other doctors did say the man needs a liver biopsy, but then they didn't do some kind of requisition form? Exactly. They didn't request it. They didn't do a utilization review, utilization management form, so someone would know to have a liver biopsy. But also What happens mechanically? Do they write it in their chart, the man should have a liver biopsy? There's another form, yes. They write it in their chart, and then there's another form that they fill out, a UHUR. So writing it in the chart doesn't generate the liver biopsy. They have to fill out a requisition form. Right. And by 2003, over 900 people have been given liver biopsies at Pelican Bay State Prison. Hepatitis C is very prevalent in the prison environment. Over 40% of the prisoners in California perhaps have the virus. Many of them have no idea they have it until they're educated on what the risk factors are. Mr. Tatum found out he had it in a blood test in 1998. The algorithm on the hepatitis C protocol or guidelines says that there are some exclusion and some inclusion criteria. One of the inclusion criteria, and the inclusion criteria, if any of them are missing, then they would have, you know, then there would, he would not be a candidate for that particular treatment, which was a very poor treatment with very bad side effects. This is all we knew in 1998 up to 2000. The good medication is out there now, and he's received it. He's actually received it twice. He's had two opportunities. It's a pegylated interferon with ribavirin. Counsel, correct me if I'm wrong, but request for the liver biopsy was denied originally. It was denied. 1203, pending further lab tests. But Tatum's treating physician, Dr. Wolf, filed that form, I guess. Yes. URUM on 12-1-2000. Right at the end, and Dr. Winslow approved it on January 30th of 2001. But Dr. Winslow finally approved Tatum for a biopsy on January 30th of 2001, almost two months after Dr. Wolf's request, and it was required that it be done within six weeks. Am I not wrong? This was eight weeks, but the requirement was if the request was not made, the liver biopsy has to be performed within six weeks. Well, you know, I understand it to be six weeks of when Dr. Winslow approves it, and they get him on a list to see a surgeon. The surgeon came out to the prison at about 30, 20, 30 a month. Sometimes he couldn't make it. You know, it's conceivable that the surgeon couldn't make it sometimes, but he was on the list for a liver biopsy. Well, the biopsy was performed eight months after he was transferred out of Pelican Bay. Well over a year, a year from the date Dr. Winslow approved the biopsy. Right. After Mr. Tatum left the prison, Dr. Winslow had no authority to continue on giving him a liver biopsy or giving him any surgical intervention. But what happened to Mr. Tatum once he left the prison, actually his numbers, his ALT, which is a very large number, he did get the liver biopsy and he did get the medication, but... But how long? I mean, he went through a great deal of suffering. And I noticed in your brief you said that there was a temporary moratorium on drug treatment. Right. But why does that result in a moratorium on liver biopsies? There wasn't a moratorium on liver biopsies, but the only thing the liver biopsy will tell you is how long he will stay on the medication. Well, today it's a stage, above a stage two at that time. Well, I don't question what a liver biopsy would show. I question the length of time it took for him to get a liver biopsy. Right. It's a test. A liver biopsy is a test and it would tell the doctors how long he would stay on the medication. I understand that. But the question is why it took so long for him to get a liver biopsy. Well, they were doing, they did have a moratorium on the drugs at that time and no one was... Liver biopsy. No, he actually, you know, honestly, I don't know. He was on the list for a liver biopsy and he was, his turn had come up and he was gone out of the prison by the time his turn came up. He left in August of 2001. So the moratorium was on the drugs, not the biopsy. No, no moratorium on the biopsy. So was there any barrier to giving him a timely liver biopsy? Well, other than he's on the list. I mean, when you say timely, that's their guidelines. That's what they would certainly shoot for, but that's not... No, the Constitution isn't subject to the guidelines. The guidelines are subject to the Constitution. And the idea is that a prisoner cannot be unduly delayed under, I think it's Gamble v. Estelle in getting essential medical care. Right, but a liver biopsy is not essential medical care. He was getting medical care. He was being every, he was in part of it. He was monitored regularly for his hepatitis C virus. You're saying a liver biopsy just falls outside what that Estelle v. Gamble case says a prisoner has to get in a timely way? If you're talking about treatment, it's not treatment. It's not therapy. It's an essential test for treatment. It's kind of like you go to the doctor. Doctor, I slipped and fell and there's something wrong with my leg. I can't walk. And he says, well, let's get you in for an x-ray. And we'll see. Gets you in for an x-ray. Your leg's broken in two places. And so they put a cast on it. Well, the x-ray isn't treatment. Doesn't do a thing for your broken leg. It's just as broken after as before. But they have to give you a prompt x-ray to see whether to cast your leg. Absolutely. It seems to me liver biopsy is the same thing. And there are various treatments that you give after one, depending on what it shows. And I don't understand why, just because people are backed up, that you don't have to follow the timeliness requirements of Estelle v. McGuire anymore. Well, you know, honestly, if he were to have the, if he was approved at the end of January, January 30th, even if they could have gotten him into six weeks, he was not a candidate at that time for the treatment. So you would be. A what? He's a candidate for the test. See, what I'm getting at is once you take total control of a man, you have to give him the medical care. And if you don't have the money for it, you've got to fire some people and use their salaries to give him the medical care. You've got to do something. Give him the medical care. Well, Your Honor, over 900 people had been given liver biopsies. I can't see that Dr. Winslow would have singled this one man out. He didn't know anything about him. He approved him for the liver biopsy. We put a moratorium. There was a moratorium. What does he need singling out for? Well, I mean, deliberate indifference means you deliberated about it and you were indifferent to him, that you knew of and disregarded an excessive risk of harm. That's Farmer v. Brennan and parroted by this court in Austin v. Terhune. If you don't know that there's an excessive risk of harm to him, you certainly can't deliberate over that and be indifferent. There is no excessive risk of harm of not having a liver biopsy. He had his liver biopsy when he did and he started his medication. There wouldn't be any point in giving a liver biopsy. It's a hypothetical case. It illustrates what I'm concerned about so you can respond to it. Let's take my broken leg hypothetical and let's just say the prison is having some financial problems, problem with the vendor of the x-ray film, one thing and another, and people are not getting timely x-rays. And without any attention or malice toward a particular prisoner, the doctors write up people with the kind of injuries that you get x-rays for and they know perfectly well they're not getting the x-rays. And a bunch of people are leaving the prison years later with bum legs because they didn't get x-rays and casts or resetting or whatever they needed. Is that okay constitutionally? Well, if you're getting, to me an x-ray is a different type of a test. If you need an x-ray to determine whether or not you have a broken leg, he doesn't need a liver biopsy to determine whether or not he has hepatitis C. What that would tell him, if he had cirrhosis, that would tell him he had cirrhosis of the liver. If he had cancer of the liver, that would tell him that. But there's many clinical markers that they are looking at through these, you know, every other month or every third month blood tests that they take of him that would tell him if he was at risk for that. He wasn't. He didn't have it. What that test tells him is how long to keep him on the medication. That's what they're using the biopsy for. He'll be on the medication for approximately a year or six months, if he's a different stage. If he's stage one, the medication doesn't seem to be having any good effect. Stage two to three is what he was, and he was a candidate for the medication and he wanted to pursue it. So he got the ribavirin with the pegylated interferon, which is still the top of the line. It's got about a 40 percent response rate, might be able to clear the virus. But, counsel, this is an interlocutory appeal on summary judgment. Now, aren't there genuine issues of material fact as to whether or not Dr. Winslow violated the treatment requirements and whether Mr. Tatum was medically qualified for a biopsy? You may well win below by presenting evidence. But the district court judge said there was enough here for him to deny summary judgment. What is your response to that? I would say in the state of Ford v. Ramirez-Palmer, this court held that after-associate v. Katz, qualified immunity cannot be denied in an Eighth Amendment case solely because there's a triable issue of fact. And the issue of fact being whether or not a prison official was deliberately indifferent. We have to look at whether or not the, what qualified immunity does. I mean, Dr. Winslow's the healthcare manager, he works extremely closely with the Madrid court. He's clearly not denying prisoners at Pelican Bay hepatitis C treatment, nor anything else. He's, in 2003, done over 900 liver biopsies. 1,500 or more men at Pelican Bay have the virus. He put together these various protocols and guidelines, which are now, which Judge Henderson approved, John Hagar, the special master, approved, they got the experts all involved, they held meetings on them. The Madrid court, which oversees essentially the treatment at Pelican Bay, knew exactly what was going on with the liver biopsies, with the, they approved, actually approved the moratorium on treatment, which I personally took an appeal on that, which I withdrew. Yeah, the moratorium on the drug treatment. Not on biopsies. And, no, not on biopsies, but if you're going to do the biopsy for the sole reason of determining whether or not he's going to stay on the treatment for, you know, six months or one year, you're not going to do a biopsy now and then a year later start him on the treatment. These two are going hand in hand with each other. They started him on the next day. And they were able to deny liver biopsies because they wouldn't have been put on drug treatment anyway. No, there were, inmates were getting liver biopsies during this time. I know for a fact they were. He had his date, he just was gone from the prison. His date came up for his liver biopsy and he was no longer there. What was that, eight months later? It was several months later, yeah, it was around, I think. I said eight, you said several. You know, honestly, I don't know what date he was actually scheduled to have his liver biopsy, but when they were going to call him, he was gone. All right, it was performed, the biopsy was performed on 5-3-0-2, eight months after Tatum was transferred out of Pelican Bay on 8-29. Right, Pelican Bay didn't have any more control over him, and obviously the prison that he went to didn't give him a liver biopsy. If you have any more questions, I'm running out of time, but I will reserve some time for the end. Thank you, counsel. Good morning, Judge Nelson, Judge Kleinfeld, and Judge Gould. My name is Lisa Turbis and I represent Appellee Marcus Tatum in this matter. This may be kind of a stupid question, but could you tell me how people get hepatitis C virus and what the liver biopsy is? I'm thinking it's an invasive procedure where you take a section of liver, put it on a microscope, see if the person has cancer or hepatitis or cirrhosis or what he's got. But I don't know if that's true. That's just my speculation. I'm no doctor, but as I understand it. I'm sure you've studied this case. I have, I have. Hepatitis C is generally contracted through tattoo needles, IV needles, generally when there is shared blood. It can also come through things like sharing toothbrushes. In this, a liver biopsy actually is a test that is performed with a long needle, as I understand it, that goes into the liver and draws cells. So it doesn't necessarily take a chunk of liver, but instead cells that are then placed on a biopsy slide and examined. Here, the biopsy results for Mr. Tatum showed that he had stage three fibrosis, which is one stage below cirrhosis of the liver. Dr. Bozovi, who is the director of hepatology over at California Pacific Medical Center, determined that, I'm sorry, testified that a biopsy is necessary not just to determine whether treatment is necessary and for how long, but also to diagnose more specifically what kind of ailment the liver is afflicted with. And that may be cancer. It may be cirrhosis. It may be, it's just telling you how much scarring there is on the liver and whether treatment for hepatitis C is necessary. But it also goes beyond hepatitis C. If Mr. Tatum had had liver cancer, we wouldn't have known until he got a liver biopsy. How can the defendant, the appellant, be said to be deliberately indifferent if there's been no request made for a biopsy on the appropriate form? Your Honor, on April 8, 1999, Dr. Winslow denied Mr. Tatum's inmate appeal for a liver biopsy. That denial was signed by Dr. Thor on defendant's behalf. As the district court noted, it's not unreasonable to infer that Dr. Winslow would have reviewed the actions taken on his behalf upon his return, even if the official documents were signed by others. That took place, as I say, in 1999, and he did not get his liver biopsy until 2002. So what was the appeal that was denied? Mr. Tatum appealed the denial of a liver biopsy. It was not actually a denial of a liver biopsy, but instead he wrote an appeal to the prison officials that he felt he needed a liver biopsy. At that point, he had, in fact, one of the prison doctors had, in fact, ordered a liver biopsy for him, and he reasonably wanted to have that liver biopsy and wondered why it was not forthcoming. So he appealed, and his appeal was denied by Dr. Winslow. As is clear from the briefs, and as I think Judge Nelson previously noted. So what you're saying is the reason that it's not true that the first time a liver biopsy for this prisoner was brought to his attention was when Dr. Wolf sent in the requisition, and when that happened, he approved it, is because he turned down the appeal through Dr. Thor, and it's inferrable that he must have known what Dr. Thor did in his name. That's right, and there are additional examples of why Dr. Winslow was deliberately indifferent. What are the additional examples? On October 26, 1999, and on three or four other occasions, Mr. Tatum wrote to Dr. Winslow pleading for a liver biopsy. As of October 26, 1999, two doctors had already approved Mr. Tatum for a liver biopsy. I would think that the doctor would look to what the treating physicians asked him for rather than what a prisoner asked him for. If you look at the excerpts of record, there are actually two different sets of notes. One is interdisciplinary patient notes. The other is physician's orders. There are several physician's orders that state, that order a liver biopsy for Mr. Tatum. Those are separate orders that go outside of the file, and I would submit that the UMUR form is referenced nowhere in the Madrid Guidelines. There is no necessity under the Madrid Guidelines to submit such a form. A physician's order, there was testimony, a physician's order trumps a UMUR form at Pelican Bay. And there are, as we state in our briefs, at least eight, possibly as many as 10 orders for a liver biopsy for Mr. Tatum from 1998 to 2001. So you're saying that doctors did fill out the forms necessary? They did fill out physician orders for the liver biopsy, that's right. A physician order is plenty. You don't need a separate requisition on this other form. That's right. That's what the record reflects. And how do we know that Dr. Winslow knew about these physician's orders? Well, we know that he, at least in April of 1999, denied a liver biopsy, despite the fact that there was a request in the order, rather, in the record for Mr. Tatum's liver biopsy. We also know that in May 2001, Dr. Winslow admitted that he had reviewed Mr. Tatum's medical records and had concluded that he was not a candidate for biopsy or treatment. What date was that? May 29, 2001. That appears in excerpts of Record 585. We also know that Dr. Higgins, a possibly ‑‑ Where would we find in the record that a physician's order trumps a URUM order? Your Honor, Dr. ‑‑ I'm sorry, Nurse Alpaw, who is the hepatitis nurse at Pelican Bay State Prison, testified to that fact in her deposition, and we have the citation to that in our brief, and I can get that for you. I will retrieve it from the brief. Thank you. Okay. Is there a standard for us to assess whether there's a genuine issue of fact as to whether there was deliberate indifference? There are two questions here. There are tribal issues on two different issues, the first being deliberate indifference, the second being whether it was clear to a reasonable ‑‑ It was clearly established. Exactly. Okay. But you wouldn't get to that. You wouldn't get to that issue if you hadn't first decided there was an issue of fact on deliberate indifference. That's right, exactly. If you conclude that there's no constitutional violation, then you go no further. If you conclude that there is a constitutional violation here, deliberate indifference to a serious medical need, then you proceed to the next step under satie, which is to determine whether the right was clearly established. And I would submit that it absolutely was. Dr. Winslow argues that because there's no legal requirement with respect to the treatment of hepatitis C, that no reasonable physician could believe that not providing a liver biopsy and treatment to a person who during a period of time did not warrant it would violate the law. Here there was a legal requirement. At a minimum, Dr. Winslow was required to comply with the Madrid‑approved Pelican Bay guidelines. Under the 1998 and 2000 guidelines, a liver biopsy is the gateway to all treatment. Only a liver biopsy reveals the stage of disease, and that dictates what kind of treatment, if any, is necessary. Thus, to deny Mr. Tatum a liver biopsy was to deny him treatment. The relevant guidelines required Mr. Tatum be given a liver biopsy as early as 1998, and Dr. Winslow acted contrary to those guidelines when he denied Mr. Tatum a liver biopsy in 1999. The Pelican Bay, as Ms. Turner pointed out, the Pelican Bay guidelines set forth inclusion and exclusion criteria for the treatment of hepatitis C. These guidelines appear at excerpts of record 117, 157, and are explained in part at paragraph 12 at 114 and paragraph 12 at 147. The absence of inclusion criteria or the presence of exclusion criteria precludes treatment except in exceptional circumstances, when then there's a reference to an MAR committee, which there was no reference to an MAR committee here, because everybody agreed that he was within the inclusion and exclusion criteria. What's an MAR committee? An MAR committee is a medical authorization review committee, and when there is a dispute as to whether someone is or rather when there is a concern about whether someone is qualified under the guidelines to receive a certain treatment, then the physician, the treating physician, can refer the case to the MAR committee for review. Here, no physician referred to the MAR committee because it wasn't necessary, because Mr. Tatum had each of the inclusion criteria and none of the exclusion criteria. Of particular relevance are the following three facts. First, Mr. Tatum had several tests with an ALT greater than 45. Per the Pelican Bay guidelines, one test with an abnormal ALT was the relevant inclusion criteria. Second, no psychiatrist acted to exclude Mr. Tatum from treatment. Per the Pelican Bay guidelines, a psychiatrist needed to act affirmatively to exclude a patient from treatment. Psychiatric clearance was not, as Dr. Winslow argues, a prerequisite to liver biopsy or to treatment. Third, Mr. Tatum had good compliance with his medications. There is form after form filled out that his compliance with medications was good. When he failed to take his medications, he consulted with his psychiatrist and with his physicians to say, listen, I'm concerned about my liver. I don't want these medications to harm my liver. Is it okay if I don't take them? And they said, absolutely, until we figure out what's going on with your liver, you don't need to take those medications because they may be harmful to your liver. So he wasn't precluded because of his psychiatric background. Absolutely not. The way that the Pelican Bay guidelines read, a psychiatrist had to act affirmatively to exclude him from treatment. Additionally, Dr. Winslow's staff physicians and reasonable prevailing medical standards at the time required that he receive a liver biopsy as early as 1998. As we've said several times, at least eight Pelican Bay doctors ordered a liver biopsy for Mr. Tatum, and they were all familiar with these Pelican Bay guidelines. At least three of them ordered drug treatment for Mr. Tatum. In your case, don't you just have to show that there's an issue of fact whether the guidelines required it? Yes. Yes, that's right. But we can go one step further than that, and I think that we do actually show that beyond an issue of fact, the law was clear under Madrid, the Madrid guidelines, that Dr. Winslow claims to have such intimate knowledge of. All of these things are clear. You wouldn't even have to show that, though, except if you were trying to get a summary judgment for your side. That's right. Is that right? You're absolutely right. At least I think that when the record comes to us on a denial of a summary judgment, we're not really in a position to really think about what's the real truth, how will it be determined at trial. All we really can think about on the record we get is whether there's an issue of fact that requires a trial. I think you're absolutely right, and here it's clear that there is an issue of fact. There are issues between the parties. We dispute facts regarding Dr. Winslow's knowledge and his participation in Mr. Tatum's treatment. We dispute facts regarding Mr. Tatum's tests and his treatment, and we dispute facts regarding the relevant Pelican Bay guidelines. There are too many relevant material facts that are in dispute to grant summary judgment on the basis of qualified immunity here. I'd also, in closing, if there are no further questions, I'd like to say that the United States Supreme Court wrote in Estelle v. Gamble that an inmate must rely on prison authorities to treat his medical needs, and if the authorities fail to do so, those needs will not be met. Here, at least eight Pelican Bay doctors wanted to treat Mr. Tatum. Dr. Winslow knowingly shortstopped that treatment, and Mr. Tatum's medical needs went unmet for more than three years. For this reason, we respectfully request that the court affirm the district court's denial of summary judgment on the basis of qualified immunity. Do you happen to remember that nurse's name whose deposition we're supposed to look at? Nurse Alpaugh, A-L-P-A-U-G-H, and we do have those attached. A-L-P-A-U-G-H. And that's the nurse who says it's not true that there's nothing for Dr. Winslow to do until somebody filled out this requisition form, and as soon as somebody did, he authorized it. That's right. Her testimony actually is that a UMUR form is merely a request, and a physician's order is exactly that. It is an order that something be done. And if I can just speak, I'm sorry, for one moment. I was just looking at my notes to respond to a point that Ms. Turner brought up. The moratorium was never in effect when Mr. Tatum was at Pelican Bay, and I think that's unclear perhaps from the record. The moratorium did not come into effect until April of 2002, and as both parties agree, Mr. Tatum left Pelican Bay in August of 2001. And one other note is that in Harris v. Coeda County, it was determined that the failure to administer necessary diagnostic tests may be deliberate indifference, and I think that goes to a question that Judge Kleinfeld had earlier. Thank you very much. Thank you, counsel. Ms. Turner, what's the government's argument with regard to the doctor's orders? Why don't the doctor's orders plus this testimony of the nurse create an issue of fact on deliberate indifference, you know, whatever the ultimate truth may be determined to be? Well, a doctor's order, Dr. Winslow is not reading every single order. He is acting on requests that are made of him through the utilization review. This is something that he does in his position at the prison. What does this nurse say? She's called the liver nurse. That's what everybody calls her out there. She's been there a long time. How do you characterize her testimony, which we can look at ourselves, but which Ms. Turbis says supports that the doctor's order is in substance of request that the procedure be done? Well, as I understand it, she had one, and it was that one in 2001. What about the eight other doctors who said? Well, you know, certainly one doctor requested it. One of them went, Dr. Higgins spoke with the inmate. This is all in 2001. And he talked to the inmate about the new drug that was coming that had a far better success rate. This one drug was a 10 percent response rate, and it had very serious side effects. All the doctors were waiting for this new drug to come out and to come to them, and it took a while for it to come on the market, but it did. The FDA approved it, and they got it at Pelican Bay, and it had a 40 percent success rate. So he spoke with him about it. The question is whether or not eight other doctors said a biopsy was indicated. Well, we haven't found eight doctors, but Dr. Benjamin put biopsy on his order, and in response to that, that was in 12 of 98, Mr. Tatum filed an inmate appeal. I would like to get a liver biopsy. It's been recommended for me. And his inmate appeal was denied not by Dr. Winslow. Dr. Winslow was absent from the institution when the appeal was denied. It's Exhibit 246 to 248. It was denied by Dr. Thor, who was the acting health care manager at that time. It's on Dr. Winslow. It was prepared for Dr. Winslow's signature, but he wasn't there. The word acting. But he did sign. Dr. Thor. Dr. Winslow. Signed on behalf of Dr. Winslow. Dr. Winslow wasn't there, so he signed in his own name. I thought the signature blank said Winslow. The signature did. Thor signed for Winslow because Winslow was absent. No. And then the judge said based on, I don't know exactly what it was based on, that Winslow must have checked to find out what Thor did on his behalf under his authority in his absence. No. Thor signed it on his own behalf. He was the acting health care manager. He put acting by his name. Clearly Dr. Winslow was absent from the institution, and he became the acting one. Absent. Was his name on the order at all? Well, it's not an order. It's a response to an inmate appeal. All right. Was Dr. Winslow's name on that response? It's printed. It looks like a printed letter that's responded to the inmate with his signature already at the bottom. Excuse me, not his signature, but his name already at the bottom. And it was signed by Dr. Thor. His name was on it. Thank you. It wasn't crossed out, but it's evident from that that he didn't see it. He wasn't even the health care manager at the time. Somebody was acting. The excerpt speech? Yes. 246 to 248. You say it's evident he didn't see it. Well. Is it evident in the context of a summary judgment where all the inferences go to the other side? Well, actually, the appeal was granted. It just said you don't meet the criteria right now. So it's not that severe of a response. But, yes, I think it's ‑‑ In a summary judgment context, how can you say that? Because you go to the second prong of socie, which you did, and you have to go to the second prong. I mean, the Supreme Court, that was the old Ninth Circuit law on ACT UP versus Bagley. Until they got to socie, now you have to go to the second prong. Why do you say you have to go to the second prong if you don't make the case stop at the first prong? Right. Are you conceding there's an issue of fact? You know, I don't think there is an issue of fact in whether or not Dr. Winslow was deliberately indifferent to a serious medical need. I don't see it. He wasn't there. He reviewed the file, and he said he didn't meet the criteria. This was well into 2001. When someone did submit a UHQR form to him, he granted it. Did anyone depose Dr. Thor? No. I would think that if I were litigating this case, I'd be deposing Dr. Thor on the one side, to try to get him to take full responsibility for it, to get him to say, well, I talked to Winslow on the phone, and he told me to go ahead and sign this form. You know what? Mr. Tatum filed the lawsuit against Dr. Winslow because he thought Dr. Winslow signed that form. I can see why. Yeah. The signature line, it's not a form, actually. It's a three-page, single-spaced memorandum written like a letter. And then at the signature blank, the handwriting is illegible, and the signature blank says DW Winslow, MD, health care manager. Based on what you've said, you can figure out that this is Thor who signed it, and he wrote A-H-C-M. Although ordinarily I wouldn't know what that meant, it's obvious here that it means acting health care manager based on what you've said. Yeah. I mean, he didn't say Dr. Thor Thor. Tatum would know that. No, he didn't know. You know, he didn't know. In fact, it was in Dr. Winslow's deposition that he found out, because it was handed to Dr. Winslow, and he said that's not my signature. So the second prong of qualified immunity, given the fact that Dr. Winslow was working with the special master, working with the court, the hepatitis guidelines now have become the model for the rest of the states. He, under Anderson v. Creighton, this is the type of person that would get qualified immunity, and there is no issue as to deliberate indifference. He didn't have the information, so he didn't deny it. Thank you, counsel. Thank you, Your Honor. Tatum v. Winslow is submitted, and we will hear Juan H. v. Serrata.
judges: D.W. Nelson, Kleinfeld, Gould